1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10

                           ----oo0oo----

11

12  UNITED STATES OF AMERICA,

13          Plaintiff,                CR. NO. 2:07-248 WBS

14              v.

15  BENJAMIN SANTOS CASTRO, MARCO     MEMORANDUM AND ORDER RE:
    ANTHONY GOMEZ, JR., and           CALCULATION OF SENTENCING
16  EDWARD FUENTES                     GUIDELINES

17          Defendants.

18  _____/

19                         ----oo0oo----

20          After a coordinated investigation with federal and

21  state law enforcement, the government indicted over twenty-five

22  defendants allegedly involved with a large drug trafficking

23  conspiracy operating under the Nuestra Familia Prison Gang

24  ("Nuestra Familia" or "NF").  Two jury trials have been held,

25  which resulted in guilty verdicts for six of the defendants, and

26  fourteen of the defendants have pled guilty, including defendants

27  Edward Fuentes, Benjamin Santos Castro, and Marco Anthony Gomez,

28  Jr.  This Order determines the total offense level and criminal

                                1

1  history category under the United States Sentencing Commission

2  Guidelines Manual ("Guidelines") for Fuentes, Castro, and Gomez.

3  See generally United States v. Johnson, 581 F.3d 994, 1001 n.4

4  (9th Cir. 2009) ("Although merely advisory after United States v.

5  Booker, 543 U.S. 220 (2005), sentencing courts must consult the

6  Guidelines as a 'starting point' for the sentencing determination

7  and the advisory 'range must be calculated correctly.'" (quoting

8  United States v. Carty, 520 F.3d 984, 991 (9th Cir. 2008))).

9       Fuentes, Castro, and Gomez each pled guilty without a

10  plea agreement to three counts from the Second Superseding

11  Indictment, which were for violations of 21 U.S.C. §§ 841(a)(1)

12  and 846 based on a conspiracy, beginning no later than April 1,

13  2004 and continuing through June 27, 2004, to distribute and

14  possess with intent to distribute at least fifty grams of

15  methamphetamine and at least five grams of cocaine and § 843(b)

16  based on the illegal use of a communication facility for the

17  purpose of drug trafficking.  All three defendants[1] objected to

18  the recommended offense levels in their respective Advisory

19  Guideline Presentence Investigation Report ("PSR").  To resolve

20  defendants' objections, the court held a three-day evidentiary

21  hearing to determine the quantity of drugs attributable to each

22  defendant and assess their roles in the offenses.

23       After conducting the evidentiary hearing, the court

24  received and considered sentencing memoranda from all parties,

25  which included defendants' numerous objections to the PSRs.  On

26

27       [1]   Reference to "defendants" in this Order refers only to
28  Fuentes, Castro, and Gomez, not all of the defendants in the
    underlying criminal case.

March 26, 2012, the court heard extensive oral arguments relative to the calculations of the Guidelines range for each defendant. The court thereupon took the issue of the Guidelines calculations under submission.

The court's findings and discussion in this Order are limited to calculating the total offense level and criminal history category for each defendant and ruling on their objections to their respective PSRs.  In making its findings when there was a dispute, the court only considered the evidence presented at the evidentiary hearing at which the defendants were present and had the opportunity to cross-examine the witnesses. The court did not consider or rely on any evidence from the prior jury trials or statements in the PSR that were not supported by the evidence at the hearing.

I.   <u>Credibility of Witnesses at Evidentiary Hearing</u>

Defendant Mario Diaz, Jr., was a high-ranking Nuestra Familia member and a significant leader in the drug trafficking operation underlying the indictments in this case.  At the sentencing hearing and jury trials, Diaz testified for the government.  The court has thus had the opportunity to observe his demeanor over the course of the hearing and two trials and finds the entirety of his testimony credible.  Given the duration of the conspiracy and the detail to which Diaz has described the numerous events that occurred, the court finds it would be nearly impossible for him to fabricate his testimony and remain as consistent as he has throughout the lengthy and repeated direct and cross examinations.  While Diaz's criminal conduct would certainly belie any suggestion that he is of good character, it

appears that he has made a conscious decision that it is in his own best interest to tell the truth.  Having gone as far as he has in betraying the NF, Diaz has nothing to gain by being anything but truthful.  While he is obviously hoping he will receive witness protection, he does not appear to be worried about whether his testimony is pleasing the government or court.  The court has also never had the impression that Diaz's testimony is influenced by any bias against his co-defendants.

Jorge Sandoval, who is a defendant in a criminal case that has been related to the one at hand, also testified for the government at the evidentiary hearing.  Although Sandoval did not recall details of events as well as Diaz, the court also found his testimony credible.  As with Diaz, Sandoval appears to have decided it is in his best interest to testify for the government and has nothing to gain by being dishonest.  His testimony was consistent with Diaz's testimony and, aside from his convictions, he was not sufficiently impeached to cast doubt on his veracity.

II.  Base Offense Level Calculation Based on Drug Quantity

"The base offense level under the Guidelines for a defendant convicted of drug trafficking depends on the quantity of drugs involved in the offense."  United States v. Dallman, 533 F.3d 755, 760 (9th Cir. 2008) (citing U.S. Sentencing Guidelines Manual ("U.S.S.G.") § 2D1.1(a)(3)).  To determine the quantity of drugs, the Guidelines provide that the court can look to all relevant conduct, which, "in the case of a jointly undertaken criminal activity," includes "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity."  U.S.S.G. § 1B1.3.  Thus, a "defendant is

4

accountable for all quantities of contraband with which he was
directly involved and, in the case of a jointly undertaken
activity, all reasonably foreseeable quantities of contraband
that were within the scope of the criminal activity that he
jointly undertook." United States v. Palafox-Mazon, 198 F.3d
1182, 1186 (9th Cir. 2000) (quoting U.S.S.G. § 1B1.3 cmt. n.2)
(internal quotation marks omitted); accord Dallman, 533 F.3d at
760.

        "Before a court can hold a defendant accountable at
sentencing for the 'relevant conduct' of others, it must 'first
determine the scope of the criminal activity the particular
defendant agreed to jointly undertake.'" Palafox-Mazon, 198 F.3d
at 1186 (quoting U.S.S.G. § 1B1.3 cmt. n.2). The Guidelines
define "jointly undertaken criminal activity" as "a criminal
plan, scheme, endeavor, or enterprise undertaken by the defendant
in concert with others, whether or not charged as a conspiracy."
U.S.S.G. § 1B1.3 cmt. n.2. The Guidelines recognize that the
scope of a defendant's jointly undertaken criminal activity "is
not necessarily the same as the scope of the entire conspiracy,
and hence relevant conduct is not necessarily the same for every
participant." Id. The Ninth Circuit has explained that the
"court may not rely simply upon the total amount involved in the
drug conspiracy, but must undertake an individualized evaluation
of the amount for which [the defendant] is accountable under the
Guidelines." United States v. Newland, 116 F.3d 400, 405 (9th
Cir. 1997).

        "The scope of the jointly undertaken criminal activity
'may depend on whether, in the particular circumstances, the

5

nature of the offense is more appropriately viewed as one jointly undertaken criminal activity or as a number of separate criminal activities.'" Dallman, 533 F.3d at 760 (quoting U.S.S.G. § 1B1.3 cmt. n.2(c)(8)); see also U.S.S.G. § 1B1.3 cmt. n.2 ("In determining the scope of the criminal activity that the particular defendant agreed to jointly undertake (i.e., the scope of the specific conduct and objectives embraced by the defendant's agreement), the court may consider any explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and others.").

        "After determining the scope of the criminal activity to which a defendant agreed, the court then determines whether the conduct of others was 'in furtherance of the jointly undertaken criminal activity' and 'reasonably foreseeable in connection with that criminal activity.'" Palafox-Mazon, 198 F.3d at 1186 (quoting U.S.S.G. § 1B1.3 cmt. n.2). Generally, "[a] defendant's relevant conduct does not include the conduct of members of a conspiracy prior to the defendant's joining the conspiracy, even if the defendant knows of that conduct (e.g., in the case of a defendant who joins an ongoing drug distribution conspiracy knowing that it had been selling two kilograms of cocaine per week, the cocaine sold prior to the defendant's joining the conspiracy is not included as relevant conduct in determining the defendant's offense level)." U.S.S.G. § 1B1.3 cmt. 2.

        "Although the guidelines clearly authorize the district court to approximate drug quantities, as with all factors which increase a defendant's offense level, the government is required

to prove the approximate quantity by a preponderance of the evidence." <u>United States v. August</u>, 86 F.3d 151, 154 (9th Cir. 1996).  "The district court must 'conclude that the defendant is more likely than not actually responsible for a quantity greater than or equal to the quantity for which the defendant is being held responsible.'"  <u>Id.</u> at 154 (quoting <u>United States v. Walton</u>, 908 F.2d 1289, 1302 (6th Cir. 1990)).  "Furthermore, the information which supports an approximation must possess 'sufficient indicia of reliability to support its probable accuracy.'"  <u>Id.</u> (quoting U.S.S.G. § 6A1.3(a)).  "Additionally, since a defendant's sentence depends in large part upon the amount of drugs attributable to his conduct, and approximation is by definition imprecise, the district court must err on the side of caution in choosing between two equally plausible estimates." <u>Id.</u>; accord <u>Walton</u>, 908 F.2d at 1302 ("[W]hen choosing between a number of plausible estimates of drug quantity, none of which is more likely than not the correct quantity, a court must err on the side of caution.").

    A.   Scope of Jointly Undertaken Criminal Activity

        The drug trafficking conspiracy giving rise to the indictments in this case spanned over numerous cities in Northern California and involved substantial quantities of drugs that would merit application of the highest base offense level for drug quantity (38) if the court attributed all of the drugs in the conspiracy to defendants.  Diaz's testimony at the evidentiary hearing revealed, however, that the scope of the criminal activity that Fuentes, Castro, and Gomez agreed to jointly undertake within the trafficking operation did not extend

7

to all of the drugs in the conspiracy.  The conspiracy involved multiple levels of command, with Diaz and defendant Larry Sixto Amaro in higher positions, and coconspirators such as Fuentes, Castro, and Gomez operating in a particular region.  The individuals operating in each region were referred to as a regiment.

The regiments, such as the San Francisco regiment and Merced regiment, functioned separately from each other and only assumed responsbility for the drugs in their region.  Although the regiments may have received better pricing based on the quantity of drugs Diaz purchased in order to supply drugs to all of the regiments, Diaz testified that he set the price of drugs separately for each regiment according to the market in the regiment's territory and did not disclose the price one regiment paid to another regiment.  Additionally, while the leader of a regiment, known within the organization as a regiment commander, was responsible to cover losses incurred by a member of his regiment (such as the loss of drugs due to an arrest of a regiment member and seizure of his drugs), the regiment commander was not responsible for and likely not aware of losses incurred by another regiment.

The structure of the drug trafficking organization and the independence of and lack of coordination between the various regiments lead the court to conclude that the drug operations of each regiment were separate criminal activities and that Fuentes, Castro, and Gomez agreed only to jointly undertake the criminal activity conducted by their regiment.  As discussed in more detail below, at varying points during the conspiracy, Fuentes

was the regiment commander for the Merced regiment and Castro and
Gomez were regiment commanders for the San Francisco regiment.
Accordingly, in determining the quantity of drugs for which each
defendant is accountable, the court will consider only the drugs
each defendant was directly involved with and the reasonably
foreseeable quantities purchased or sold within the area
controlled by each defendant's regiment during the time the
defendant was operating in the regiment.

B.   Base Offense Level for Fuentes

In the PSR, the probation officer concludes that the
evidence is sufficient to support a base offense level of 38 for
Fuentes, but recognizes that "the Court has not yet made a
finding as to the amount(s) of drugs attributable to the
defendant" and thus the offense level "is subject to change."
Fuentes objects to a base offense level of 38 and contends that
the appropriate base offense level is 32.

Diaz testified that he first met Fuentes in 2006 when
he was a Norteño and, at that time, Fuentes had instructions from
an NF member housed in Pelican Bay to establish a regiment in
Merced.  (Dec. 6, 2011 Tr. ("Dec. 6 Tr.") 45:9-13, 45:23-46:17,
47:16-22.)  Diaz explained to Fuentes that anything happening on
the streets was under the control of the NF generals in federal
custody, which, as the authority ran down the control chain,
included Diaz and Amaro.  (Id. at 49:8-50:5.)  After this
discussion, Fuentes "fell in suit," agreeing to be under the
authority of the NF generals in federal custody, and thus Diaz.
(Id. at 50:18-23.)  Diaz determined that Fuentes was the best
person to start a regiment in Merced and gave him instructions to

9

1 "build a regiment and start flowing in with drugs, start bringing

2 in drugs to [Merced]." (Id. at 51:2-10, 52:2-3.) Fuentes was

3 willing to take that responsibility, and Fuentes and Diaz started

4 trafficking drugs together, with Fuentes serving as the regiment

5 commander for Merced. (Id. at 52:9-24.)

6        At the evidentiary hearing, Diaz estimated that the

7 total amount of methamphetamine he supplied to Merced directly

8 through Fuentes was "more than three pounds." (Dec. 7, 2011 Tr.

9 ("Dec. 7 Tr.") 192:23-193:4.) Intercepted calls between Diaz and

10 Fuentes corroborate this testimony. For example, in an

11 intercepted call on March 28, 2007, Fuentes asked whether a

12 delivery of drugs had come in and Diaz and Fuentes discussed the

13 pricing for pounds of methamphetamine. (Dec. 6 Tr. 67:21-68:9;

14 Gov't Evidentiary Hr'g Ex. ("Ex.") 6 at 4.) During the call,

15 Fuentes also referenced a $19,000 debt he owed to Diaz for

16 purchases of drugs he had made from Diaz on credit. (Dec. 6 Tr.

17 68:20-22; Ex. 6 at 6.) Diaz also testified that the majority of

18 the drugs he provided Fuentes was methamphetamine, but recalled

19 giving him nine ounces (a quarter of a kilogram) of cocaine on

20 one occasion. (Dec. 6 Tr. 68:21-69:1.) The court will therefore

21 attribute three pounds of methamphetamine and nine ounces of

22 cocaine to Fuentes based on this uncontroverted evidence.

23        As regiment commander, Fuentes also instructed

24 individuals under him, including Nicolas Saldana, to pick up

25 drugs from Diaz on his behalf. (Id. at 54:12-22.) Diaz

26 testified that Saldana "picked up one-pound quantities of crystal

27 methamphetamine on at least four occasions, different occasions"

28 and that those four pounds were separate from the three pounds

1  Diaz provided directly to Fuentes.[2]  (Dec. 7 Tr. 234:25-235:17.)

2  Not only are the drugs Saldana picked up from Diaz attributable

3  to Fuentes based on Diaz's testimony that Saldana picked them up

4  on behalf of Fuentes for the Merced regiment, Diaz also testified

5  that when Saldana was arrested while he was in possession of

6  drugs he had picked up from Diaz, Fuentes assumed the debt to

7  Diaz for the confiscated drugs.  (Dec. 6 Tr. 55:6-23.)

8          Fuentes argues that the court should not rely on Diaz's

9  testimony about Saldana picking up four pounds of methamphetamine

10 from Diaz on behalf of Fuentes.  First, Fuentes emphasizes that

11 Diaz had worked with Saldana before Fuentes started working with

12 Diaz, (see Dec. 7 Tr. 187:2-4, 242:18-20), thus Saldana could

13 have picked up some or all of the four pounds from Diaz before he

14 worked for Fuentes.  The court finds it unlikely that Diaz

15 included any quantities given to Saldana before Saldana was

16 working for Fuentes because the questions clearly referred only

17 to drugs that Saldana picked up on behalf of Fuentes.  (See id.

18 at 235:13-17.)

19         Second, Fuentes argues that notes taken by an

20 investigator during a debriefing with Diaz on August 1, 2007

21 discredit Diaz's testimony because the notes indicate only that

22 Diaz stated that the total amount of methamphetamine supplied to

23 Merced through Fuentes was three pounds.  The omission of any

24

25         [2]    Fuentes requests that the court strike the following
26 sentence from paragraphs 26 and 35 of the PSR: "A confidential
   source reported Nick Saldana picked up one pound of
27 methamphetamine on four separate occasions for the defendant."
   This statement is consistent with Diaz's credible and
28 uncontroverted testimony at the hearing, thus the court will deny
   Fuentes's request to strike that statement from the PSR.

reference to the four pounds Saldana picked up in the
investigator's notes does not discredit Diaz's testimony,
especially because the court has generally found live testimony
or a transcript of an interview to be more accurate than an
investigator's notes that may contain errors or omissions and
inevitably lack the context of statements.  Additionally, Diaz
told investigators about the four pounds provided to Saldana in
another FBI debriefing.  (See id. at 234:22-235:4.)  Overall, the
weight of the evidence persuades the court that Diaz's estimation
about the four pounds of methamphetamine delivered to Saldana was
limited to the time Saldana was working for Fuentes and was in
addition to the three pounds he testified were distributed to
Merced through Fuentes.  The court will therefore include that
four pounds of methamphetamine in calculating Fuentes's base
offense level.

The government also argues that intercepted calls
between Fuentes and Diaz show that Fuentes and Diaz reached
additional agreements for the sale of drugs that should be
included in calculating Fuentes's base offense level.  Under the
Guidelines, an agreement to sell a specific quantity of drugs can
be considered in calculating a defendant's base offense level.
See U.S.S.G. § 2D1.1 cmt. n.12 ("In an offense involving an
agreement to sell a controlled substance, the agreed-upon
quantity of the controlled substance shall be used to determine
the offense level unless the sale is completed and the amount
delivered more accurately reflects the scale of the offense.").
In an intercepted call between Diaz and Fuentes on May 22, 2007,
Fuentes told Diaz about the possibility of obtaining a pound of

methamphetamine from someone in San Jose for $9,500 per pound and
the possibility of exchanging a kilogram of their cocaine with
that dealer.  (See Dec. 6 Tr. 84:7-56:4; Ex. 11.)  After
recounting his conversation with the dealer in San Jose and
discussing with Diaz the possibility of such a sale, the
discussion about the potential sale ended with Fuentes saying, "I
told Woody to see what's up, maybe we could come up on
something."  (Ex. 11 at 4.)  Neither the intercepted call nor
Diaz's testimony at the hearing prove that Fuentes or Diaz
reached an agreement with the dealer in San Jose to conduct an
exchange or sale of drugs.  Discussions about a possible source
of methamphetamine and possible purchaser for cocaine do not
result in an "agreed-upon quantity of [a] controlled substance"
sufficient to use in calculating Fuentes's base offense level.

          Similarly, in a second intercepted call about two hours
later that day, Fuentes told Diaz that he wanted to buy
methamphetamine, but nothing in the conversation or Diaz's
testimony indicates that they reached an agreement.  At the time
of the call, Diaz did not have methamphetamine to sell to Fuentes
and was waiting to receive about three pounds.  (Dec. 6 Tr.
89:10-15.)  For example, Diaz told Fuentes that Fuentes's "guys
didn't like" the methamphetamine Diaz had access to at the time
and the other kind he could buy was too expensive.  (Ex. 12.)
Again, they discussed the possibility of purchasing them from the
San Jose dealer.  (Id.)  As the call ended, Fuentes said, "Oh
man, let me call Woody and see what, what we could do with
Samuel, bro."  (Id.; see also Dec. 6 Tr. 86:4-11 (Samuel is an NF
carnal in San Jose).)  From the evidence, the court concludes

13

that it was not likely that Fuentes and Diaz reached an agreement
for the purchase of methamphetamine in that phone conversation
and, if they subsequently reached an agreement, the amount was
likely included in Diaz's estimate of the total quantity of
methamphetamine he sold to Fuentes.

Lastly, the government argues that Fuentes is
responsible for the multiple pounds of methamphetamine Diaz
testified he purchased in the last two weeks of May 2007 and the
ten pounds of methamphetamine in his possession when he was
arrested on May 26, 2007.  Diaz was arrested only five days after
Fuentes's May 22 conversation with him in which Fuentes and Diaz
did not come to an agreement about Fuentes purchasing
methamphetamine from Diaz.  Diaz did not testify that he was
intending to sell any of that methamphetamine to Fuentes, and it
is plausible that the ten pounds in Diaz's possession was the
cheaper methamphetamine that Diaz had indicated that Fuentes's
"guys" did not like.  There is therefore insufficient evidence to
establish that the drugs in Diaz's possession at the time of his
arrest, or any drugs he purchased just prior to his arrest, were
within the scope of the criminal activity that Fuentes undertook
in selling methamphetamine in the Merced regiment.

Although the totality of the evidence leaves the court
convinced that Fuentes was involved with more drugs than the
specific quantities established through the evidence, the court
must limit itself to the most conservative estimation based on
the evidence.  Accordingly, the court finds it more likely than
not that Fuentes was directly involved with or agreed to jointly
undertake criminal activity involving at least seven pounds of

14

methamphetamine and nine ounces of cocaine, providing for a base offense level of 34.[3]

C.   <u>Base Offense Level for Castro</u>

The PSR for Castro explains that "it appears he was aware of all of the drugs being distributed by the DTO, and all of the criminal conduct of the DTO will be used to determine the offense level." The PSR thus recommends a base offense level of 38. Castro objects to the use of the highest level, arguing that the appropriate base offense level is 34.

Castro is a Norteño, and Diaz testified that he personally delivered methamphetamine to Castro on at least six occasions in 2006 and 2007. (Dec. 6 Tr. 99:6-17.) He testified that each delivery was "always" more than one pound of methamphetamine and explained, "in fact, the majority of the time it was over a pound. I mean, it was like -- sometimes in the beginning it was like five pounds, four pounds." (<u>Id.</u> at 99:21-24.) From this testimony, the government and Castro reach different estimates about the quantity of methamphetamine Diaz delivered to Castro. Castro contends that Diaz's testimony supports a finding of only twelve pounds, reasoning that two of

---

[3]   In calculating the base offense level for each defendant, section 2D1.1 of the Guidelines provides for differing controlled substances to be converted to their marijuana equivalents in order to obtain a single base offense level. The section provides drug equivalency tables to calculate such conversions, and the marijuana equivalent for "methamphetamine (actual)" is significantly greater than the marijuana equivalent for just "methamphetamine." <u>See</u> U.S.S.G. § 2D1.1 cmt. n.10(D). Because neither the PSRs nor the government suggest that the marijuana equivalent for "methamphetamine (actual)" should be used, the court assumes that the methamphetamine defendants purchased and sold was not "methamphetamine (actual)" and will thus use the lower marijuana equivalent in calculating the base offense levels for defendants.

the deliveries were four pounds each and the remaining four
deliveries were one pound each.  The government, on the other
hand, argues that Diaz's testimony supports a finding of twenty
to twenty-five pounds, reasoning that at least four of the sales
were four or five pounds each.

      "[W]hen choosing between a number of plausible
estimates of drug quantity, none of which is more likely than not
the correct quantity, a court must err on the side of caution."
Walton, 908 F.2d at 1302.  So long as Castro's estimate is
plausible in light of Diaz's testimony, the court must adopt his
lower calculation.  The difference in Castro's and the
government's calculations stems from the following testimony:

          Q: What were the -- do you recall, like, a number
          of pounds from during these six or so occasions?  More
          than one pound, less than a pound?

          A: No, it was more.  It was always -- in fact, the
          majority of the time it was over a pound.  I mean, it
          was like -- sometimes in the beginning it was like five
          pounds, four pounds.

(Dec. 6 Tr. 99:18-24.)  Castro's calculation of the first two
sales at four pounds each is plausible because Diaz testified
that "in the beginning it was like five pounds, four pounds."
Although the "beginning" sales may have also been at five pounds,
it is unclear from Diaz's testimony whether he was estimating
that one or more sales were for five pounds or he was uncertain
whether the "beginning" sales were for four or five pounds.  The
"beginning" sales could also include more than the first two
sales and, according to the government, the majority of the sales
were at the level of the "beginning" sales.  While such
interpretations are plausible, the court will err on the side of

caution and adopt the four pound estimate only for the first two

"beginning" sales as it is the most conservative of the possible

estimations.

However, Castro's estimate that the remaining sales

were for only one pound each is not plausible in light of Diaz's

testimony that a "majority" of the sales (at least four of the

six sales) were "over a pound."  The next two sales comprising of

the majority of the sales must have thus been at a quantity that

exceeded one pound.  The court's impression from Diaz's testimony

is that he primarily sold methamphetamine in pound increments and

did not cut a packaged pound into lower quantities.  The court

therefore finds it most likely that a sale for "over a pound"

would have been at least two pounds.  Adopting the most

conservative calculation that is plausible in light of Diaz's

testimony, the court finds that at least two of the six sales

were for two pounds because, taken with the first two sales for

four pounds, this would result in a majority of the sales being

over one pound.  With the remaining two sales, because Diaz

testified that the six sales were "always" for a pound, the only

plausible estimate is that they were for at least one pound, and

thus the court will adopt the most conservative estimate that the

remaining two sales were for one pound each.[4]  Accordingly, the

most conservative calculation based on Diaz's uncontroverted

testimony is that he personally delivered fourteen pounds to

Castro and the court will therefore use this quantity in

_____

[4]    Castro's conclusion that "a minority of the time, the
deliveries were under a pound" is not plausible in light of
Diaz's testimony.  (See Dec. 6 Tr. 99:18-24.)

calculating Castro's base offense level.[5]

In an intercepted call with Diaz on April 5, 2007, Castro also discussed a pound of marijuana that he had received and given to another individual to sell.  The court will therefore attribute that pound of marijuana to Castro in calculating his base offense level.

The PSR recounts an intercepted call between Castro and Diaz on April 17, 2007 in which Castro told Diaz he wanted to increase his prior order for five kilograms of cocaine to seven kilograms.  Castro concedes that this agreement to purchase seven kilograms of cocaine from Diaz is attributable to him, (Docket No. 1054 at 6:12-14), and thus the court will include that quantity of cocaine in calculating his base offense level.

On May 24, 2007, Gomez was arrested and cocaine was seized from his home during a search.  In an intercepted call with Diaz that day, Castro told Diaz about Gomez's arrest and asked Diaz whether Castro owed anything for drugs he had obtained from Diaz.  (Ex. 23; Dec. 7 Tr. 138:19-139:5.)  After Diaz informed Castro that Gomez owed $3,300 or $3,200 and that Diaz could not absorb the loss, Castro assured Diaz that he would take care of the debt.  (Ex. 23.)  Diaz explained at the evidentiary hearing that Castro discussed Gomez's debt with Diaz because clearing the debt was part of Castro's responsibility as a

---

[5]   Castro requests the court to strike the following two sentences from paragraph 52 of the PSR: "Between 2006 and 2007, on at least six occasions, Diaz and/or his associates would deliver methamphetamine to Castro.  The deliveries would consist of anywhere between 1 pound up to 4 or 5 pounds of methamphetamine."  (Docket No. 1054 at 13:19-14:4.)  This summary is supported by Diaz's testimony and thus the Court will deny Castro's request to strike these two sentences.

regiment commander for San Francisco.  (Dec. 7 Tr. 139:4-14.)
Because Diaz gave Gomez the cocaine as a member of the San
Francisco regiment and Castro agreed to take responsbility for
Gomez's remaining debt for the drugs, the cocaine was within the
scope of the criminal activity to which Castro agreed to jointly
undertake.  Although Castro may not have known the quantity of
drugs Gomez had obtained from Diaz or whether his debt was
$33,000 or $3,300, the fact that Castro asked Diaz whether Castro
owed anything shows that it was reasonably foreseeable to Castro
that Gomez had obtained drugs from Diaz.  The parties do not
dispute that the cocaine found at Gomez's residence and the drugs
giving rise to his debt were part of the two kilograms of cocaine
Gomez had obtained from Diaz, thus those two kilograms of cocaine
are attributable to Castro and will be included in calculating
his base offense level.

Based on the seven kilograms of cocaine he ordered and
two kilograms of cocaine Gomez obtained, the government contends
that the entire twenty kilograms of cocaine Diaz obtained in May
2007 are attributable to Castro.  As previously discussed,
however, the scope of the criminal activity that Castro agreed to
participate in was limited to drug trafficking in his regiment,
not drug trafficking in all of the regiments under Diaz.  As
previously discussed, while Diaz's ability to order significant
quantities based on the cumulative need of the regiments may have
allowed him to obtain a lower price, he testified that he set the
pricing for the drugs he sold according to the market in each
regiment and did not inform regiment commanders about the volume
of drugs provided to other regiments.  (See id. at 218:2-21; see

1  also id. at 216:24-217:15 & Ex. 21 at 4 (although Castro knew

2  about at least ten of the kilograms Diaz had obtained, Diaz

3  testified that it was unlikely he knew about the entire twenty

4  kilograms).)  Accordingly, because the kilograms of cocaine that

5  were not supplied to the San Francisco regiment were beyond the

6  scope of criminal activity that Castro agreed to jointly

7  undertake, the entire twenty kilograms Diaz obtained in May of

8  2007 are not attributable to Castro.

9        The government also seeks to attribute additional

10 purchases of methamphetamine and cocaine to Castro based on an

11 intercepted call between Castro and Diaz on May 5, 2007.  During

12 the conversation, Castro and Diaz discussed the pricing available

13 for methamphetamine and cocaine in the Bay Area, but it is

14 unclear whether Castro had purchased the drugs for the prices he

15 quoted or was simply telling Diaz about the market price for

16 drugs in the area.  When asked to "describe what [he] understood

17 [Castro] to be telling [him] during that part of the call," Diaz

18 explained only that Castro was telling him that "they have access

19 to both cocaine and methamphtamines."  (Dec. 6 Tr. 131:13-16

20 (emphasis added).)  The court therefore finds that the

21 conversation does not establish that Castro had either purchased

22 or entered into an agreement to purchase methamphetamine or

23 cocaine and thus the court will not attribute additional

24 quantities to Castro based on the intercepted call.[6]

25

26      [6]   For the same reason, the court will grant Castro's
   request to strike the probation officer's interpretation of the
27 call from the PSR, which is the last sentence of paragraph 30 and
   states, "Further, Castro states he got some methamphetamine and
28 was waiting for the cocaine."

1    Lastly, the government seeks to attribute approximately

2   five pounds of methamphetamine to Castro based on discussions

3   Castro and Diaz had in intercepted calls about Castro having

4   found someone to help "cook" methamphetamine or a source to

5   obtain ephedrine to make methamphetamine.  Although the "agreed-

6   upon quantity" from an agreement to sell a controlled substance

7   can be attributed to a defendant, <u>see</u> U.S.S.G. § 2D1.1 cmt. n.12,

8   the evidence does not establish that Castro reached an agreement

9   with the potential cook.  Although Diaz was very interested in

10   purchasing ephedrine from Castro's source, neither the

11   intercepted calls nor Diaz's testimony show that Castro's source

12   ever came to fruition or that an agreement was reached.  The

13   court will therefore not attribute any quantity of

14   methamphetamine to Castro based on these discussions.

15    Accordingly, while the totality of the evidence leaves

16   the court with the impression that Castro was involved with more

17   drugs than the specific quantities discussed, the court will only

18   attribute the conservative estimate of fourteen pounds of

19   methamphetamine, nine kilograms of cocaine, and one pound of

20   marijuana, which provides for a base offense level of 36.[7]

21

---

22    Castro also moves to strike the assertions in paragraph
    61 of the PSR, "including but not limited to the assertion that
23   Castro was involved 'in the buying and selling of multiple
    kilograms of cocaine and methamphetamine over a three year
24   period.'"  (Docket No. 1054 at 8:6-9.)  Although striking the
    generalized summaries is unnecessary because they are consistent
25   with the evidence from the evidentiary hearing, the court relies
    on the evidence presented at the hearing, not the summaries in
26   the PSR.

27    [7]    Castro objects to the following sentence from paragraph
    125 of the PSR: "The defendant was a major distributor of cocaine
28   and methamphetamine for the [drug trafficking organization] in

D.   <u>Base Offense Level for Gomez</u>

In the PSR for Gomez, the probation officer explains that Gomez "was aware of all the drugs being distributed by the DTO, and all of the criminal conduct of the DTO will be used to determine the offense level."  The PSR thus recommends a base offense level of 38 for Gomez, and Gomez objects, arguing that the appropriate level is 32.

Gomez is a Norteño[8] and was a regiment commander for San Francisco in 2004.  (Dec. 6 Tr. 2:14-25, 5:1-10, 20-25.) Diaz testified that he first met Gomez in 2004 and sold him approximately two pounds of methamphetamine at their first meeting.  (<u>Id.</u> at 2:14-3:13.)  Gomez concedes that these two pounds of methamphetamine are attributable to him in calculating his base offense level.  (Docket No. 1053 at 1:20-22.)  At the evidentiary hearing, Diaz also estimated that, in 2004, he supplied Gomez with no less than five pounds of methamphetamine. (Dec. 6 Tr. 23:3-9.)  Diaz specifically recalled one instance when Gomez purchased methamphetamine from him at an apartment in

the Bay Area of California."  (Docket No. 1054 at 9:5-10.) Although use of the adjective "major" could be debated, the sentence is consistent with the quantities the court has discussed and relies on, thus striking the sentence from the PSR is unnecessary.

[8]   Gomez objects to the statements in paragraph 30 of the PSR that indicate that Gomez was "indoctrinated into the NF" in 2004 and was "given authority by Amaro to act as an NF member." Diaz testified that Gomez was only a Norteño and never an NF member, (Dec. 6 Tr. 18:2-17; Dec. 7 Tr. 170:4-6), and Sandoval testified that he only assumed Gomez was an NF member because another NF member introduced Gomez to him as a "loved one," which he interpreted to mean he was a member of the NF.  (Dec. 7 Tr. 6:22-25.)  The weight of the evidence suggests that Gomez was not an NF member, thus the court will strike the aforementioned statements from paragraph 30.

2004 and that Sandoval had accompanied Gomez to the apartment.
(Id. at 7:9-14.)  Diaz testified that he and Gomez went into a
room privately and Gomez told him that he did not want Sandoval
to know the pricing for the drugs.  (Id. at 7:19-8:20.)

Sandoval's testimony corroborates Diaz's testimony that
Diaz supplied Gomez with at least five pounds of methamphetamine
in 2004 and that one purchase occurred in an apartment as Diaz
described.  Sandoval testified that he drove to Salinas with
Gomez on five or six occasions in 2004 and it was his
understanding that the purpose of the trips was for Gomez to pick
up drugs or drop off money.  (Dec. 8, 2011 Tr. ("Dec. 8 Tr.")
33:17-14, 35:8-36:4, 38:1-20.)  On the first trip, Sandoval
testified that Gomez had told him he had about $40,000 in cash
with him in a shoe box and that he saw Gomez bring the shoe box
into the apartment.  (Id. at 19:8-21.)  Gomez left in possession
of some type of object and told Sandoval that he had about a half
of a kilogram of cocaine and showed Sandoval what Sandoval
believed was a couple pounds of methamphetamine.  (Id. at 20:7-4,
22:21-23:6.)  Consistent with Diaz's recollection, Sandoval also
testified that Gomez had a discussion out of his presence at the
apartment and, when Gomez and Sandoval returned to the car, Gomez
told Sandoval that he had told the individuals in the apartment
that Sandoval did not know what was going on.  (Id. at 21:16-23.)

Based on Diaz's and Sandoval's testimony, the court is
persuaded by a preponderance of the evidence that Gomez obtained
at least five pounds of methamphetamine from Diaz in 2004 and
will thus attribute that quantity to Gomez.  With respect to
cocaine, Diaz testified that he supplied Gomez with cocaine but

23

could not recall a quantity.  (Dec. 6 Tr. 23:10-17.)  Based on Sandoval's uncontroverted testimony, the court finds that Diaz supplied Gomez with at least half of a kilogram of cocaine in 2004.

Diaz also testified that Gomez had incurred a substantial debt for drugs purchased from Diaz or his associates, (id. at 9:20-10:17; Dec. 7 Tr. 237:7-12), and Sandoval testified that the debt was approximately $17,000, (Dec. 8 Tr. 44:19-25). As a result of his debt, Gomez "abandoned" his position as regiment commander in San Francisco and his whereabouts were unknown.  (Dec. 6 Tr. 10:16-22.)  In Gomez's absence, Sandoval became one of the individuals in charge of San Francisco, (Dec. 8 Tr. 46:8-13), which made him one of the individuals responsible for Gomez's debt.  Sandoval testified that, during the time Diaz and his associates were looking for Gomez to collect on the debt, he knew where Gomez was and began working with him to repay the debt.

To raise funds to repay Gomez's debt, Sandoval told Gomez to "give [Sandoval] some of his connections," meaning the "people that [Gomez] was selling pounds and selling kilos of cocaine to."  (Id. at 61:3-13.)  Sandoval testified that Gomez agreed to this arrangement and turned over his customers to Sandoval.  Sandoval, who previously was unable to sell methamphetamine at the pound level, was then able to sell pounds of methamphetamine to Gomez's former customers and used part of

the proceeds to pay down Gomez's debt.[9]  (Id. at 62:19-63:5)
Sandoval specifically testified about two different customers
Gomez gave him, which were Mario Gonzales and "White Boy, Allen,"
(id. at 61:19-24), and that Allen was willing to buy drugs from
Sandoval because Allen had a personal relationship with Gomez and
knew about Gomez's debt, (id. at 64:5-14).  Although Gomez was
hiding from Diaz and the upper leaders in the conspiracy at this
time, the sales Sandoval made to Gomez's customers under their
arrangement to pay down Gomez's debt are attributable to Gomez
because Gomez knew that the drugs were coming from Diaz and his
associates and Gomez gave his customers to Sandoval so that
proceeds from the sales could be used to pay down his debt to
Diaz.  (Id. at 61:3-15.)

          Sandoval estimated that he did approximately twenty-
five deals each with Gonzales and Allen in 2005 and 2006 and that
all of the deals were for at least a pound of methamphetamine,
with some for as much as five pounds.  (Id. at 62:10-18, 63:16-
22.)  These estimates would exceed fifty pounds of
methamphetamine, which dwarfs the estimates of sales discussed at
the evidentiary hearing.  The court also notes that Diaz never
estimated the quantity of drugs that he or his associates sold to
Sandoval in 2005 and 2006, and Sandoval did not testify that the
proceeds from every sale were used to pay Gomez's debt.  (See id.
at 66:23-15.)  With sales at this quantity, the court also finds

---

[9]     Diaz's testimony that he began working with Gomez again
because Gomez had "a lot of ties to San Francisco" and that "a
lot of people did know him," (Dec. 6 Tr. 25:2-9), corroborates
Sandoval's testimony about Gomez having significant customers
that he could pass on to Sandoval.

it likely that Sandoval's connection to the customers through Gomez became less significant as the sales continued.  Given these considerations, the court will err on the side of caution and only attribute five pounds of methamphetamine to Gomez based on Sandoval's sales to Gomez's former customers in 2005 and 2006.[10]

Sandoval also testified that, during the time Gomez was "hiding" in the winter and spring of 2005, Sandoval provided him with cocaine he obtained from Diaz and Gomez was "involved in sales up to a kilo at a time." (Id. at 65:23-66:7, 67:25-68:4.) Sandoval testified that he would take Gomez to the area for a sale and that Gomez "would run and do his transaction and then come out to the car and give me the money." (Id. at 66:12-16.)

---

[10]   Gomez requests the court to strike the entirety of paragraph 38 from the PSR.  The bulk of paragraph 38 recounts Gomez's involvement with producing a CD, "Game Untold," which was funded with money from drug sales and created to give the impression of a legitimate income.  Sandoval testified to all of the details in the PSR about the CD and thus the court will not strike the paragraph.  (See Dec. 8 Tr. at 27-33.)
Paragraph 38 also states that, in 2005:

> Gomez was connected to the NF during this time frame as he was selling pound quantities of methamphetamine and kilogram quantities of cocaine to "White Boy," also known as Mario Gonzalez, and "Al," also known as Alan Peters. Additionally, Gomez was allegedly getting the methamphetamine and cocaine from the Salinas regiment of the NF.  Testimony presented indicated in 2005, at least 6 kilograms of cocaine as sold to Gomez.

(PSR ¶ 38.)  Although these statements generally reflect Sandoval's testimony at the evidentiary hearing, there are several errors, such as the fact that Sandoval testified that he, not Gomez, was selling to "White Boy, Allen" and Gonzalez and that he only supplied Gomez with cocaine.  In determining quantities attributable to Gomez for these transactions, the court relies only on Sandoval's testimony at the evidentiary hearing and, to the extent the statements in paragraph 38 conflict with Sandoval's testimony at the evidentiary hearing, the court strikes the statements from the PSR.

He explained that the profits were used to pay Gomez's debt, but
that he would let Gomez "take a couple hundred bucks just for
expenses." (Id. at 66:17-22.) Sandoval estimated that he
provided Gomez with cocaine during this period "seven times
maybe" and that on some occasions it was a full kilogram and on
other occasions it was less than a kilogram. (Id. at 68:5-18.)
Although Sandoval did not estimate the total quantity of cocaine
he provided to Gomez during this period, his testimony persuades
the court that it was more likely than not that Gomez sold at
least one kilogram of cocaine during that period, thus the court
will attribute one kilogram of cocaine to Gomez based on those
sales.

        At some point in 2006, Diaz began dealing with Gomez
again after Gomez's debt was paid. (Dec. 6 Tr. 14:23-15:2.)
Diaz estimated that, in 2006 and 2007, he or his associates
supplied Gomez with no less than three pounds of methamphetamine
and no less than two kilograms of cocaine. (Id. at 21:23-22:25.)
Diaz's testimony about supplying methamphetamine and cocaine to
Gomez during 2006 and 2007 is corroborated by several intercepted
calls between Gomez and Diaz in which they discussed Gomez's drug
orders.[11] (See Exs. 3-5; see also Dec. 6 Tr. 35:17-11, 37:22-
38:3, 40:19-41:6, 42:22-43:9 (Diaz's testimony about the
intercepted calls); Dec. 7 Tr. 154:18-25 (same).) Gomez has also
conceded that Diaz supplied him with two kilograms of cocaine in

_____

[11] The court will not attribute the quantities discussed
in the calls on April 15, 2007, April 17, 2007, and May 23, 2007
to Gomez because Diaz estimated the "total" amount of drugs he
supplied to Gomez during that time period; thus it is more likely
than not that Diaz's estimate included purchases discussed in the
intercepted calls.

May of 2007, a half of a kilogram of which was in Gomez's possession when he was arrested that month.  (Docket No. 1053 at 1:22-24.)  The court will therefore attribute the three pounds of methamphetamine and two kilograms of cocaine to Gomez in calculating his base offense level.

While the court's conservative estimates lead to a total of three-and-a-half kilograms of cocaine that Gomez was directly involved with, in his Acceptance of Responsibility Statement submitted to the court, Gomez wrote, in his own handwriting, "I did conspire with Mario Diaz to sell more than 500 G of Meth and at least 5 KG of cocaine."  The court's estimate, therefore, clearly errs on the side of leniency. Nevertheless, the court will only attribute a total of three-and-a-half kilograms of cocaine to Gomez in calculating his base offense level.

In an intercepted call March 24, 2007, Gomez and Diaz also discussed methamphetamine that Gomez purchased from a dealer other than Diaz or his associates.  In the call, Gomez and Diaz discussed at least one pound of methamphetamine that Gomez had already purchased from the other dealer and Gomez indicated that he "got rid of the one I had" and that the "white boys" he sold it to said it was "really strong."  (Ex. 1 at 2-3.)  During the call, Diaz also indicated that he wanted Gomez to get additional methamphetamine from the other dealer and the two agreed that Gomez would get an additional two pounds for Diaz.  (Id. at 3-4.) Based on the intercepted call and Diaz's testimony about it, (see Dec. 6 Tr. 27:9-30:1), the court finds it more likely than not that Diaz obtained one pound of methamphetamine from a dealer

28

other than Diaz and, based on the agreement, supplied Diaz with
at least two pounds of methamphetamine from that dealer.  Because
these additional three pounds of methamphetamine are separate
from the total quantity of methamphetamine Diaz estimated he
supplied to Gomez, the court will include the three pounds in the
total quantity attributed to Gomez.

    The court will not, however, attribute additional
quantities based on the intercepted call on May 23, 2007.  In
that call, Gomez and Diaz discussed prices for methamphetamine
that Gomez had access to, but Gomez agreed only to look into the
quality a little more and it does not appear that they reached an
agreement for the sale of methamphetamine.  (Ex. 3 at 3-4.)  Diaz
also testified that "everybody fishes in the market out there . .
. saying, you know, I can get it for this price to see if they
can get you to lower it" and that he felt Gomez was lying or
"BSing" at times because his statements about what he could get
for particular prices did not always make sense.  (Dec. 7 Tr.
158:13-159:8.)  Sandoval also testified that Gomez was often
untruthful and told lies.  (Dec. 8 Tr. 103:18-104:25.)
Similarly, although the call shows that Gomez had knowledge about
a prospective trade with an individual who wanted twenty-five
kilograms of cocaine in exchange for methamphetamine, the court
is not persuaded that an agreement was reached for such a trade.
(See Dec. 6 Tr. 41:15-42:13.)  The court will therefore not
attribute additional pounds of methamphetamine to Gomez based on
this conversation.

    For the same reasons discussed with respect to Castro,
the court will not attribute the entire twenty kilograms of

cocaine Diaz obtained in May 2007 to Gomez.  As previously discussed, the scope of the criminal activity Gomez agreed to jointly undertake was limited to the San Francisco regiment and Diaz testified that Gomez did not have a role in Diaz obtaining the twenty kilograms of cocaine and Gomez was only one of the multiple "customers" Diaz had.  (See Dec. 7 Tr. 167:20-168:9.) Additionally, Gomez was no longer leading the San Francisco regiment in 2007, thus making it less likely that Diaz's entire purchase of cocaine could be attributed to him.

Lastly, the court will not attribute any quantity of marijuana to Gomez based on a robbery of a marijuana trafficker that Sandoval testified occurred sometime in 2003.  Although the robbery was conducted by lower-level members of the San Francisco regiment, it occurred before the conspiracy charged in this case. It was also unclear from Sandoval's testimony whether Gomez knew about it before it occurred, (Dec. 8 Tr. 12:14-13:14), and Sandoval testified only that he assumed part of the proceeds were given to Gomez.  (See id. at 13:17-14:25.)

As with the other defendants, the totality of the evidence persuades the court that Gomez was directly involved with or agreed to jointly undertake criminal activity involving more than the precise quantities the court can pinpoint from the evidence.  Nonetheless, the court will limit its calculation to the most conservative estimates supported by the evidence and therefore finds that Gomez is responsible for at least sixteen pounds of methamphetamine and at least three-and-a-half kilograms of cocaine, which results in a base offense level of 36.

///

30

III.   Aggravating Role Enhancement

         The PSR for each defendant recommends that each defendant be given a two level aggravating role enhancement pursuant to section 3B1.1(c) of the Guidelines.  All three defendants object to an aggravating role enhancement.  Section 3B1.1 provides for the following increase to a defendant's offense level based on the defendant's role in the offense:

>     (a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by **4** levels.
>
>     (b) If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by **3** levels.
>
>     (c) If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by **2** levels.

U.S.S.G. § 3B1.1.

         An increase to an offense level for an aggravating role is appropriate if a preponderance of the evidence supports a finding that the defendant occupied one of the specified roles. United States v. Maldonado, 215 F.3d 1046, 1050 (9th Cir. 2000); United States v. Avila, 95 F.3d 887, 889 (9th Cir. 1996).  To determine "whether a defendant was an organizer or leader, as opposed to a manager or supervisor," the court should consider the following factors:

>     "[T]he exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others."

Avila, 95 F.3d at 889-90 (quoting U.S.S.G. § 3B1.1 cmt. n.4).

31

"[T]o sustain a finding that a defendant was an organizer or a leader, 'there must be evidence that the defendant exercised some control over others involved in the commission of the offense [or was] responsible for organizing others for the purpose of carrying out the crime.'" Id. at 889 (quoting United States v. Harper, 33 F.3d 1143, 1151 (9th Cir. 1994)).

It is undisputed that the drug trafficking conspiracy giving rise to this criminal case had more than five participants.  Some of the defendants contend, however, that the regiments they led had less than five participants.  The Ninth Circuit has held that "[a]n enhancement under §§ 3B1.1(a) or (b) does not require control over all of the five or more participants." United States v. Garcia, 497 F.3d 964, 970 (9th Cir. 2007).  "While an enhancement under section 3B1.1(a) or (b) is proper only in a criminal activity involving more than five participants, there is no requirement . . . that the defendant exercise authority over at least five participants before the enhancement can be applied." United States v. Barnes, 993 F.2d 680, 685 (9th Cir. 1993).  At the same time, the Ninth Circuit has explained that the exercise of authority over only one other participant does not preclude the enhancement as a matter of law, but "would perhaps be insufficient to support the enhancement [if] there was no other indication of leadership." Id.

A. Aggravating Role Enhancement for Fuentes

The PSR indicates that Fuentes "appears to have been a supervisor" and recommends a two level enhancement under section 3B1.1(c).  When Diaz first met Fuentes in 2006, Fuentes was a Norteño and had been given "full authority" to establish a

32

regiment in Merced from James Perez, a high-ranking NF member who
was incarcerated at Pelican Bay prison. (See Dec. 6 Tr. 45:21-
47:22.)  After Fuentes met with Diaz, Diaz agreed that Fuentes
would be the regiment commander of Merced and instructed Fuentes
to report to Diaz, not Perez. (Id. at 49:8-51:10.)  Diaz
testified that, as the regiment commander of Merced, Fuentes was
"there front and center," had "been upgrading everything," and,
"[s]ince when we started working with him, thing started falling
more in place, things started getting more structured, more
organized." (Id. at 61:20-24.)

As the regiment commander of Merced, Diaz testified
that Fuentes "was in charge of all Merced functions," that
"[a]nything Merced County that was going on over there, he was
the go-to guy there," and that Fuentes was actively supervising
and managing individuals in the Merced regiment. (Id. at 52:19-
53:2.)  Diaz identified at least seven individuals who were under
Fuentes's authority in the Merced regiment, including  "Woody,"
Nicolas Saldana, Julian Zotelo, "Dee," "Listo," "Sammy," and
Jesse Zotelo. (Id. at 53:3-54:11.)  As regiment commander,
Fuentes obtained drugs from Diaz and then distributed the drugs
to participants under his authority.  Even after Fuentes
distributed the drugs to the participants under him, the
responsibility to pay Diaz for the drugs remained with Fuentes.
For example, Diaz testified that Saldana was arrested while in
possession of drugs and that Fuentes paid Diaz for the debt
resulting from the seized drugs. (Id. at 55:10-56:1.)  As
regiment commander, Fuentes also had the responsbility to "have
sort of a bank in the regiment so when events like [arrests]

occur, they could pay for lawyer fees or, you know, whatever the regiment needs." (Id. at 67:4-10.)  The evidence at the evidentiary hearing also established that, when Saldana was arrested, Fuentes assumed the responsbility to pay for Saldana's lawyer fees.  (Id. at 67:4-13.)

Diaz also testified about an instance when Fuentes reported to Diaz that Listo, one of the individuals in Fuentes's regiment, was "messing up," using drugs, and becoming more of a "liability" than an "asset" for the organization.  (Id. at 70:3-9.)  Diaz testified that, as Listo's supervisor, Fuentes was expected to take care of the issue and Fuentes told Diaz that, because Listo owed money to the Merced regiment, Fuentes took a bulletproof vest and other items from Listo to "get everything he could from [Listo] before he either got in trouble or something happened where he wouldn't get nothing in return for the debt that Listo owed."  (Id. at 70:17-25.)

The testimony at the evidentiary hearing also established that Fuentes had a significant role within the Norteño and NF organizations.  First, Perez had given Fuentes authority to act as a "sponsor" and "pull" a new member into the Norteño gang, and Diaz testified that Fuentes acted on this authority and "pulled" an individual named "Woody" from San Jose into the Norteño gang.  (Id. at 47:22-10, 54:3.)  Second, Diaz credibly testified that Fuentes was indoctrinated into the NF in 2007.  Once Fuentes was an NF member, Diaz testified that he would solicit Fuentes's input about incidents involving Fuentes's regiment.  (See id. at 62:7-63:12; id. at 87:20-88:2 ("You know, basically even before [Fuentes] became an NF member, he was

34

already awarded that authority [in Merced].  So if [incidents]
came to him, I mean, we [(Diaz and Amaro)] would let him know,
include him in it.  But basically he probably wouldn't have no
say.  Like, we wouldn't take, you know, his word at value.  I
mean, we would just, like, you know, deal with it ourselves.  But
we would get his input now that he was an NF member, see what he
thought about the incident.").)  Third, when Fuentes was
arrested, kites were found at his residence and Diaz testified
that Fuentes would have received kites because, "since he's in
charge of that area, he's in charge of everything that goes on in
Merced, not just -- not just the streets, but in the county jail
as well.  So, therefore, he will be abreast of what's going on in
jail."  (Id. at 60:7-13.)

        Overall, in the context of the limited quantity of
drugs that were attributed to him, Fuentes had a significant
management and supervisory role over at least seven individuals
within his Merced regiment.  Especially with his increased
influence once he became an NF member, it would be reasonable to
consider him a lower-level leader within the drug trafficking
operation.  The court finds that the evidence clearly supports a
two level aggravating role enhancement and, because the number of
participants in the drug trafficking operation and even those
directly under Fuentes exceeded five, the evidence likely
justifies a three or even four level role enhancement.  In light
of the probation officer's recommendation for only a two level
enhancement and the lack of an express objection by the

1   government to that recommendation,[12] the court will give Fuentes

2   the benefit of the doubt and only assess a two level enhancement

3   under section 3B1.1(c).

4       B.   Aggravating Role Enhancement for Castro

5           The PSR recommends a two level enhancement under

6   section 3B1.1(c) for Castro, stating that he "was a leader and

7   distributor" in San Francisco for the drug trafficking conspiracy

8   and that, "[w]hile he operated under the direction of Amaro (who

9   was the leader of the conspiracy), and Diaz, he managed

10  coconspirators in the Bay Area along with Gomez."  (PSR ¶ 62.)

11  Castro objects to the assessment of a leadership enhancement.

12          At the evidentiary hearing, Diaz testified that

13  initially in 2005 and for part of 2006, Castro had an "active

14  role[]" in the conspiracy, but co-defendant Bismark Martin Ocampo

15  had primary authority in San Francisco and Castro reported to

16  him.  (See Dec. 6 Tr. 98:6-99:2, 102:1-12.)  At that time, Castro

17  was "picking up all of the drugs" and "was the one that was kind

18  of on the streets all the time dealing with the day-to-day, you

19  know, issues and stuff, and he would report to Mr. Ocampo in

20  early 2006."  (Id. at 98:6-15, 102:1-12.)  Based on Castro's

21  involvement in 2005 and into part of 2006, the court finds it

22

23          [12]   In its response to Fuentes's sentencing objections, the
    government states, "FUENTES, in fact, should be assessed a three
24  or four level upward adjustment based on the number of
    individuals he actively supervised during this conspiracy."
25  (Docket No. 1065 at 10:11-13.)  In its Sentencing Recommendation,
    however, the government did not object to the offense level in
26  the PSR or advocate for an increased role enhancement.  (See
    Docket No. 1066 at 4:1-3.)  The government's statement in its
27  response to Fuentes's sentencing objections is therefore
    insufficient to put Fuentes on notice that the court would
28  consider a three or four level role enhancement.

more likely than not that he was only a manager or supervisor in the drug trafficking organization, but was not a leader.

When Ocampo was arrested in 2006, however, Diaz explained that Castro "was there, so we just kept dealing [drugs] with him," (id. at 102:13-20), and, at some point in 2006, he "was handling things for -- for the organization in San Francisco" and became a regiment commander for San Francisco, (id. at 16:11-18; see also Dec. 7 Tr. 233:17-20).  Diaz identified nine individuals under Castro's authority in 2007, including Gomez, Sandoval, "Coco," Daniel Zapeta ("Termite"), "Mondo," "Bazil," "Cheech," "Dopey," and "Bam Bam."  (Dec. 6 Tr. 25:10-19, 101:16-25, 105:11-15; Dec. 7 Tr. 136:21-137:13, 139:6-14.)  Castro also took responsibility to pay for Ocampo's lawyer, (Dec. 6 Tr. 115:9-18), and to "open up new avenues" for his regiment to obtain and make methamphetamine in 2007.  (Id. at 109:12-25, 120:10-20; Exs. 13, 16.)

At the same time, however, Diaz testified that he dealt drugs directly with other regiment members in San Francisco because he had already been doing so prior to Castro assuming authority.  (Dec. 7 Tr. 229:22-230:5, 230:20-231:1.)  Castro thus did not have "full authority" over all of the drugs in the San Francisco regiment, but had authority over "all the politics and stuff and issues" and if there was a "violation" by a regiment member, such as a member dating another member's girlfriend, it was Castro's responsbility to "launch an investigation and see

37

1    what's going on."[13]   (Id. at 230:1-231:9.)

2        When Ocampo was released, the evidence from the hearing

3    revealed that the San Francisco regiment had internal conflicts

4    and disputes over leadership.  (See Dec. 6 Tr. 111:15-112:8,

5    115:19-21.)  The disputes over leadership between at least Castro

6    and Ocampo culminated in a meeting on March 26, 2007, and it was

7    decided that Castro would remain the regiment commander for San

8    Francisco and Ocampo would be given authority east of San

9    Francisco.  (Id. at 39:2-5.)  Castro argues that he should not be

10   assessed a two level enhancement because this meeting did not

11   occur until the day Diaz was arrested.  Although Diaz was

12   arrested that day, the evidence does not suggest that the

13   conspiracy immediately terminated upon Diaz's arrest, (see Dec. 7

14   Tr. 231:22-232:3), and Castro entered a guilty plea to a

15   conspiracy that ended on or about June 27, 2007.  Regardless,

16   Castro's role in the offense before the meeting on May 26, 2007

17   is sufficient to justify a two level enhancement under section

18   3B1.1(c).  Diaz's credible and uncontroverted testimony also

19   established that the decision at the meeting was that Castro

20   would "remain with full authority of the San Francisco regiment,"

21   not be given authority for the first time that day.  (See Dec. 6

22   Tr. 38:19-24, 96:13-16; Dec. 7 Tr. 224:1-8, 225:25-226:10, 229:7-

23   19.)

24        At a minimum, Castro served a significant management

25   _____

26       [13]   Based on Diaz's testimony that Castro did not have full
     authority over the drugs distributed to the San Francisco
     regiment, the court will grant Castro's request to strike the
27   statement in paragraph 52 of the PSR that "in 2006/2007 Castro
     was given full authority over the San Francisco regiment after
28   Ocampo was arrested."

and supervisory role in San Francisco and, while he did not have

full authority over all of the narcotics for the region, he was

at least one of the leaders in San Francisco.[14]   Moreover,

because Castro is only being held responsible for the limited

quantity of drugs he was personally involved with in his

regiment, his leadership over those drugs is sufficient to

support a leadership role enhancement.   The evidence therefore

clearly supports the recommended two level enhancement under

section 3B1.1(c) and, while a three or four level enhancement may

be merited, the court will not assess a greater enhancement in

the absence of an objection to the two level recommendation by

the government.[15]

    C.   Aggravating Role Enhancement for Gomez

        For Gomez, the PSR recommends a two level enhancement

under section 3B1.1(c) and states that Gomez "was a leader and

distributer of marijuana, cocaine, and methamphetamine for the

Diaz [drug trafficking organization] in the San Francisco,

California, regiment" and "managed coconspirators in the Bay

---

[14]   Castro requests the court to strike the following
sentence from paragraph 125 of the PSR: "However, he also was in
a position of authority over a geographical area where he managed
other conspirators making his activities vital to the success of
the drug organization."  (Docket No. 1054 at 9:11-16.)  The
court finds that this synopsis is consistent with the evidence
from the hearing and, while the court relies on the evidence, not
the synopsis in the PSR, it is unnecessary to strike the sentence
from the PSR.

[15]   Again, while the government argues in its response to
Castro's sentencing objections that a four level enhancement is
more appropriate, (see Docket No. 1064 at 12:4-7, 13:4-7), it did
not object to the probation officer's recommended offense level
and adhered to it in its Sentencing Recommendations.  (See Docket
No. 1066 at 3:20-23.)  Castro therefore did not receive notice
that the court would consider a three or four level role
enhancement.

1  Area." Gomez objects to an aggravating role enhancement.

2          Diaz testified that when he first met Gomez in 2004,
3  Gomez was a Norteño and Amaro told him that Gomez "was handling
4  things for the NF in San Francisco." (Dec. 6 Tr. 5:1-4.) Diaz
5  explained that Gomez "was basically like the RC [(regiment
6  commander)] out there" and "had a leadership role in the San
7  Francisco area, so any issues or drug transactions were going to
8  be through him." (Id. at 2:14-25, 5:1-10, 20-25.) Diaz
9  explained that drugs were delivered to Gomez and then Gomez would
10 distribute them to "his manpower" and was responsible for the
11 debt incurred for the drugs. (Id. at 11:17-23.) At that time,
12 Amaro had told Diaz that there were about fifteen participants
13 working under Gomez for the San Francisco regiment, although the
14 only two Diaz knew during that time were "Ray Ray" and "G." (Id.
15 at 11:24-12:11.)

16         Sandoval's testimony corroborates Diaz's testimony
17 about Gomez's leadership position in San Francisco.
18 Specifically, Sandoval testified that an NF carnal introduced him
19 to Gomez and that Gomez was serving as the carnal's "right-hand
20 man" and assumed authority when the carnal went to prison. (Dec.
21 8 Tr. 6:14-7:7.) He also testified that Gomez was "in charge of
22 San Francisco in 2003" and when some of the lower members robbed
23 a marijuana trafficker, it was Sandoval's understanding that the
24 "contributions" to the NF were paid through Gomez. (Id. at
25 12:18-19, 14:4-8, 42:2-5.) Sandoval testified that there were
26 only about four participants in the San Francisco regiment in
27 2004. (Id. at 116:8-20.)

28         The court recognizes that Gomez abandoned his position

in San Francisco when he incurred a significant debt to the organization and, even after he began selling drugs again, it was unlikely that he would return to a leadership position in the future.  (See Dec. 6 Tr. 24:13-25:5; Dec. 7 Tr. 227:19-228:3; Dec. 8 Tr. 46:10-13.)  Nonetheless, his abandonment of his leadership position and lower level within the conspiracy when he began selling drugs again does not diminish the role he had in San Francisco in 2004 especially when viewed in the context of the limited quantity of drugs attributed to him.  At a minimum, the evidence at the hearing establishes that Gomez served as a manager or supervisor for the San Francisco regiment in 2004. Accordingly, the court will assess a two level aggravating role enhancement against Gomez pursuant to section 3B1.1(c).

IV.  Gun Enhancement for Gomez

Section 2D1.1(b)(1) of the Guidelines increases the offense level by two points "[i]f a dangerous weapon (including a firearm) was possessed" by the defendant.  For Gomez, the PSR recommends a two level enhancement under section 2D1.1(b)(1) and states that, when Gomez's home was searched incident to his arrest in 2007, the officers found a .25 caliber firearm and rounds of .45 caliber ammunition on a portable closet in the downstairs bedroom.  (PSR ¶ 26.)  In the upstairs bedroom, the officers also found a safe containing a pink .25 caliber firearm and a magazine containing live rounds of .25 caliber ammunition. (Id.)

With respect to the gun found in the downstairs bedroom, Gomez submitted a declaration from Evette Lacome and a Report of Investigation from an interview with Alan Peters.

41

According to these submissions, Lacome and Peters are a married couple who were renting the downstairs bedroom of Gomez's home. The unit had one bedroom and one bathroom and a separate entrance off of the inside of the garage that was secured with a dead-bolt.  Lacome and Peters believed that Gomez did not have a key to the dead-bolt.  Peters also told the investigator that Gomez had nothing to do with anything in his apartment.

With respect to the pink gun found upstairs, Gomez submitted a declaration from his wife, Cynthia Gomez.  She indicated that the pink gun belonged to her and that she obtained it prior to her marriage to Gomez.  She kept it in a safe and had lost the key to the safe, thus the officers found the gun only after they broke the safe open during the search.

At the evidentiary hearing, the government did not put on any evidence to rebut these statements, and the government did not address the firearm enhancement in its briefing.  Based on the uncontroverted statements Gomez submitted, the court finds that the government has not established that Gomez owned or had access to either of the guns found during the search of his home. The court will therefore not increase his offense level by two points under section 2D1.1(b)(1).

V.   Third Level Acceptance of Responsibility Reduction

Section 3E1.1 provides for a two level reduction if "the defendant clearly demonstrates acceptance of responsibility for his offense" and an additional one level reduction if:

> the defendant qualifies for a decrease under subsection (a), the offense level determined prior to the operation of subsection (a) is level 16 or greater, and upon motion of the government stating that the defendant has assisted authorities in the investigation or prosecution of his

own misconduct by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently, decrease the offense level by 1 additional level.

U.S.S.G. § 3E1.1(b). "[T]he government has been vested with broad discretion to determine when the § 3E1.1(b) adjustment is appropriate." Johnson, 581 F.3d at 1001 (quoting United States v. Medina-Beltran, 542 F.3d 729, 731 (9th Cir. 2008)) (internal quotation marks omitted) (alteration in original); see also U.S.S.G. § 3E1.1 cmt. n.6 ("The timeliness of the defendant's acceptance of responsibility is a consideration under both subsections, and is context specific . . . [and] the Government is in the best position to determine whether the defendant has assisted authorities in a manner that avoids preparing for trial."). "A district court may review the government's refusal to file a § 3E1.1(b) motion and grant the additional one-level reduction sua sponte if it finds that the decision was (1) animated by an unconstitutional motive (e.g., racial discrimination), or (2) arbitrary--i.e., not rationally related to a legitimate governmental interest." Johnson, 581 F.3d at 1001. "[A] defendant who challenges the government declining to move for a third level of acceptance of responsibility has a threshold evidentiary burden to show unconstitutional motive, or arbitrary governmental action." United States v. Espinoza-Cano, 456 F.3d 1126, 1136 (9th Cir. 2006).

With respect to Gomez, the government did not move for a third level acceptance of responsibility reduction because Gomez "decided to enter guilty pleas only after the government

43

could no longer avoid preparing for trial." (Docket No. 1060 at 20:24-25.) Gomez objects, arguing that his guilty plea was timely and that the government is arbitrarily withholding the third level reduction from him. "[T]he timeliness of a defendant's decision to plead guilty will necessarily depend on the extent of trial preparation already undertaken prior to the plea and the decision's proximity in time to the trial date." United States v. Hopper, 27 F.3d 378, 385 (9th Cir. 1994).

Here, Gomez did not enter a guilty plea until this case had been pending for almost four years and only twenty-two days remained before his confirmed trial date. On November 15, 2010, the court set Gomez's trial date for April 26, 2011 and, at the trial confirmation hearing on March 28, 2011, Gomez confirmed his trial date and the government estimated that the trial would last approximately ten days. After confirming his trial date, defendant filed a notice of intent to plead guilty and the court ultimately accepted his open guilty plea on April 4, 2011 and vacated his trial date.[16]

In its response to Gomez's sentencing objections, the government has identified, in detail, the extensive and time-consuming preparation it completed in anticipation of Gomez's trial, including flying outside of California with the FBI case agent between February 27, 2011 and March 4, 2011 to have Diaz

---

[16] Although defendant filed a notice of intent to plead guilty on March 29, 2011, the government represents that it continued to prepare for trial until the plea was actually taken because it "had no guarantee the defendant would follow through with his 'intent' to plead guilty." (Docket No. 1060 at 23:14-21.) The government was not unreasonable in continuing to prepare for trial until the trial date was vacated.

review the numerous wiretapped calls involving Gomez.  Between March 4 and the trial confirmation on March 28, the government began preparing trial subpoenas for an anticipated thirty to forty trial witnesses.  After the trial confirmation hearing, the government "began the process of culling all of the available intercepted wiretap calls between GOMEZ and DIAZ down to a manageable number of calls to be introduced at trial" and marking the selected calls as anticipated trial exhibits.  (Docket No. 1060 at 22:25-28.)  After the trial confirmation hearing, the government prepared and served additional subpoenas on anticipated trial witnesses and made preparations through the Department of Justice and United States Marshals Service to have two witnesses in the Witness Security Program available for trial.

Based on the time-consuming trial preparation the government undertook in February, March, and April, the court finds that the government was justified in declining to move for the third level reduction under section 3E1.1(b) because Gomez's guilty plea was not timely and did not permit the government to avoid preparing for trial or allocate its resources efficiently. Moreover, Gomez's reliance on the fact that the government has moved for the third level reduction for most of the other defendants in this case who have pled guilty does not demonstrate that the government acted unconstitutionally or arbitrarily in its decision to withhold the reduction in his case.  The court is confident that the government weighed the relevant considerations and made individual assessments for each defendant to determine whether the defendant's guilty plea allowed the government to

avoid preparing for trial and efficiently allocate its resources.

Citing United States v. Lee, 653 F.3d 170 (2d Cir. 2011), Gomez contends that the government wrongfully withheld the third level reduction because his open plea necessitated the government to prepare for and participate in the evidentiary hearing.  In Lee, the Fourth Circuit held that it was "unlawful" for the government to withhold a third level reduction based on the "grounds that it had been required to prepare for a Fatico hearing" because the defendant pled guilty without a plea agreement and the defendant's objections to the PSR necessitated an evidentiary hearing.  Lee, 653 F.3d at 173.  The Fourth Circuit first reasoned that "the plain language of § 3E1.1(b) refers only to the prosecution resources saved when the defendant's timely guilty plea 'permit[s] the government to avoid preparing for trial'" and a Fatico evidentiary hearing is not a "trial."  Id. at 174 (quoting U.S.S.G. § 3E1.1(b)) (alteration in original).  Similarly, the Fourth Circuit emphasized that "the Application Notes for § 3E1.1 [] refer only to the government's ability 'to determine whether the defendant has assisted authorities in a manner that avoids preparing for trial.'"  Id. (quoting U.S.S.G. § 3E1.1 cmt. n.6).  Lastly, the Fourth Circuit reasoned that "a defendant--even one who pleads guilty--has a due process right to reasonably contest errors in the PSR that affect his sentence" and should not be punished for doing so.[17]

---

[17]    The government has not relied on the resources it expended in preparing for the evidentiary hearing to justify its withholding of the third level reduction, and moved for the third level reduction for Fuentes and Castro.  The court, therefore, does not rely on the time expended in preparing for and

1    The Fourth Circuit's decision in <u>Lee</u> appears to be
2  inconsistent with Ninth Circuit precedent.  Unlike the Fourth
3  Circuit in <u>Lee</u>, the Ninth Circuit has not employed an impractical
4  and narrow reading of section 3E1.1(b) and has explained that,
5  "[w]hen § 3E1.1(b) speaks of conserving government resources in
6  the 'prosecution' of the defendant's 'misconduct,' it means more
7  than simply trial preparation." <u>Johnson</u>, 581 F.3d at 1002.
8  "'Prosecution' is commonly understood to encompass the entirety
9  of the criminal proceedings in a particular case until judgment
10  is final and certain." <u>Id.</u>  In <u>Johnson</u>, the Ninth Circuit held
11  that "the allocation and expenditure of prosecutorial resources
12  for the purposes of defending an appeal is a rational basis for
13  declining to move for the third reduction point." <u>Id.</u>

14    As support for its holding in <u>Johnson</u>, the Ninth
15  Circuit cited <u>United States v. Sainz-Preciado</u>, 566 F.3d 708 (7th
16  Cir. 2009), which is directly on point with the case at hand.  In
17  <u>Sainz-Preciado</u>, the defendant pled guilty to drug charges in the
18  indictment and thus "spared the expense of a trial," but did not
19  admit his involvement in all ten drug transactions charged, thus
20  necessitating an evidentiary hearing "to prove the full scope" of
21  his criminal conduct. <u>Sainz-Preciado</u>, 566 F.3d at 716.  The
22  Seventh Circuit held that the "added burden to both the
23  government and the court system [caused by the sentencing
24  hearing] gave the government good reason (if it needed one) not
25  to file a § 3E1.1(b) motion." <u>Id.</u>

26

27  participating in the evidentiary hearing in finding that the
28  government did not unconstitutionally or arbitrarily withhold the
    third level reduction from Gomez.

1        In this court's humble opinion, giving any of these

2   three defendants even a two point reduction for acceptance of

3   responsibility under section 3E1.1(a), much less an additional

4   point under subsection (b), is ludicrous.  If just pleading

5   guilty is synonymous with accepting responsibility, then these

6   defendants deserve the two point reduction.  But if any more is

7   required, this court fails to see why they should be entitled to

8   such a benefit.  The gravamen of this case with respect to these

9   defendants lies in the quantity of drugs involved and the

10  defendants' respective roles in the conspiracy.  To simply come

11  into court almost four years after being indicted and admit to

12  the bare bones of the charges and then put the government to its

13  proof on the all issues that make the most difference in

14  sentencing should not, in this court's view, constitute

15  acceptance of responsibility.

16       Beyond that, the additional point reduction under

17  subsection (b) is supposed to be reserved for those defendants

18  who have assisted the authorities in the investigation or

19  prosecution and permitted the government "and the court" to

20  allocate their resources more efficiently.  The court would be

21  hard pressed to find that even Castro and Fuentes have done

22  anything substantial to assist the court in allocating its

23  resources.  Technically, these defendants may have permitted the

24  government and the court to avoid a "trial" in the literal sense.

25  But to the extent that a trial is viewed as the questioning of

26  witnesses on direct and cross-examination, the presentation of

27  evidence and arguments, and the rendering of a decision by the

28  trier of fact, from which the defendants may appeal, for all

48

1  practical purposes the sentencing hearing through which these
2  defendants put the government and the court was as much of a
3  trial as most others.   Indeed, the court cannot recall when it
4  has been called upon to devote more time and effort to any
5  sentencing proceeding.

6          Nevertheless, the government has for some reason deemed
7  it appropriate to move the court to give all three of these
8  defendants credit for acceptance of responsibility under section
9  3E1.1(a) and to further give Castro and Fuentes an additional
10 point reduction under section 3E1.1(b).   If the court felt it had
11 the discretion to do so, it would not only refuse the additional
12 point reduction to Gomez, but would also not give Fuentes or
13 Castro the benefit of the additional point under section
14 3E1.1(b).

15 VI.  <u>Criminal History Category for Castro</u>

16         Recognizing that "[r]epeated criminal behavior is an
17 indicator of a limited likelihood of successful rehabilitation,"
18 the Guidelines provide for the calculation of a defendant's
19 criminal history category that is then used to determine the
20 Guidelines range.   U.S.S.G. § 4A1.1 introductory cmt.   Castro's
21 PSR calculates his criminal history at category V based on the
22 fact that Castro was on parole at the time he committed the
23 instant offenses and has the following five adult convictions: 1)
24 1998 misdemeanor conviction for battery committed on June 29,
25 1998; 2) 2000 misdemeanor conviction for battery committed in
26 2000; 3) 2001 misdemeanor conviction for battery committed on
27 January 1, 2001; 4) 2004 felony conviction for assault with a
28 deadly weapon committed on May 13, 2002; and 5) 2002 misdemeanor

1    conviction for assault with a deadly weapon committed on
2    September 27, 2002.  (PSR ¶¶ 70-73, 76.)

3          Castro does not dispute that the probation officer
4    correctly treated all of his adult convictions as crimes of
5    violence and properly calculated his criminal history category
6    under section 4A1.1.  Castro contends, however, that the court
7    should depart downward from the resulting criminal history
8    category because all but one of his convictions were for
9    misdemeanors and two of his criminal history points resulted from
10   his status as a parolee at the time he committed the offenses
11   charged in this case.  Section 4A1.3(b) provides that a downward
12   departure from a criminal history category "may be warranted" if
13   "reliable information indicates that the defendant's criminal
14   history category substantially over-represents the seriousness of
15   the defendant's criminal history or the likelihood that the
16   defendant will commit other crimes."  The court does not find
17   that a downward departure is merited for Castro.

18         Although four of Castro's prior convictions were for
19   misdemeanors, the Guidelines necessarily take this factor into
20   consideration in assessing only one point for a prior sentence
21   less than sixty days and two points for a prior conviction of at
22   least sixty days but less than or equal to one year and one
23   month.  See U.S.S.G. § 4A1.1.  Castro thus received only one
24   point each for three of his misdemeanor convictions and two
25   points for his 2000 misdemeanor conviction because the sentence

26

27

28

for that offense was sixty days.[18]  Castro's misdemeanor

convictions for violent conduct against his victims is precisely

the type of criminal behavior the Guidelines contemplate being

taken into account when determining a defendant's criminal

history category.  See id. § 4A1.2(c) (providing that misdemeanor

offenses are counted, but then exempting certain non-violent

offenses); id. § 4A1.3 cmt. n.2(B).  Castro's misdemeanor

convictions have thus resulted in a criminal history category of

V not because they "over-represent[] the seriousness of the

defendant's criminal history or the likelihood that the defendant

will commit other crimes," but because Castro committed four

violent misdemeanors in a relatively short duration of time.

Similarly, the Guidelines expressly provide for the

addition of two points if a defendant was on parole at the time

he committed the instant offense, which is based on "extant

empirical research assessing correlates of recidivism and

patterns of career criminal behavior."  See U.S.S.G. § 4A1.1(d) &

introductory cmt.  Here, Castro was on parole for a violent

felony after being sentenced to four years in prison at the time

he was serving as the regiment commander for San Francisco and

selling methamphetamine and cocaine.  The addition of these two

points is consistent with the rationale that Castro's return to

criminal behavior while on parole suggests a greater chance of

recidivism and thereby justifies a higher criminal history

---

[18]   Even if the court departed downward by allocating only
one point to Castro's 2000 conviction because the sentence was
exactly sixty days and thus right on the cusp of receiving the
second point, Castro would still have a criminal history category
of V because he would have a total of ten criminal history
points.  See U.S.S.G. § 5, Pt. A (Sentencing Table).

1  category.

2       Overall, Castro's criminal history justifies a criminal
3  history category of V because he has repeatedly committed violent
4  offenses in close proximity to each other without any suggestion
5  of an effort to become a law abiding citizen.  Accordingly,
6  because there is no "reliable information indicat[ing] that the
7  defendant's criminal history category substantially
8  over-represents the seriousness of the defendant's criminal
9  history or the likelihood that the defendant will commit other
10 crimes," the court declines to depart downward from the
11 calculation of Castro's criminal history at category V+

12      Neither Gomez nor Fuentes object to the calculation of
13 the criminal history category in their PSRs.

14      For the foregoing reasons, the court hereby finds that
15 the total offense levels and criminal history categories for the
16 defendants are as follows:

17      The total offense level for **Fuentes is 33** (34 base
18 offense level based on drug quantity; +2 for aggravating role
19 enhancement; -3 for acceptance of responsbility), and his
20 criminal history category is **III**.

21      The total offense level for **Castro is 35** (36 base
22 offense level based on drug quantity; +2 for aggravating role
23 enhancement; -3 for acceptance of responsbility), and his
24 criminal history category is **V**.

25      The total offense level for **Gomez is 36** (36 base
26 offense level based on drug quantity; +2 for aggravating role
27 enhancement; -2 for acceptance of responsbility), and his
28 criminal history category is **III**.

DATED:   May 1, 2012

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE